

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

## AUSTIN DIVISION

| | | |
|---|---|---|
| JONATHAN CHEEK, On Behalf of Himself and All Others Similarly Situated, | § § § | Civil Action No. A05CA0970 LY |
| Plaintiff, | § § | CLASS ACTION |
| vs. | § § § | |
| MOTIVE, INC., SCOTT L. HARMON, PAUL M. BAKER, MICHAEL J. MAPLES, SR., THOMAS J. MEREDITH, DAVID SIKORA, ERIC L. JONES, MICHAEL LaVIGNA, JOHN D. THORNTON, SCOTT R. ABEL and DOUGLAS F. McNARY, | § § § § § § § § § | |
| Defendants. | § § § | DEMAND FOR JURY TRIAL |

## COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS



## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of Motive, Inc. ("Motive" or the "Company") between June 25, 2004 and October 26, 2005, inclusive (the "Class Period"), including those who purchased their shares pursuant to the Company's June 2004 Initial Public Offering ("IPO"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"). Defendant Motive supplies management software for networked products and services. The Company's shares trade on the NASDAQ, an efficient market where, on average, hundreds of thousands of Motive shares trade daily.

2.      The Company's IPO was extremely difficult to consummate. Few companies, if any, have experienced the level of difficulty that was experienced by Motive in going public. On July 13, 2000, the Company filed its Registration Statement with the SEC in hopes of going public shortly thereafter. With the meltdown of the Internet/software companies, interest in bringing the Company public waned. After defendants initially withdrew the Company's Registration Statement in the Spring of 2001, the Company made another attempt in the Winter of 2003/2004. With the Company on life support (unbeknownst to prospective investors), defendants needed to bring the Company public at almost any cost. Waiting for the Company's *true* condition to improve was not an option. Defendants realized that in order to raise $50 million to keep the Company afloat and provide a vehicle to monetize their own Motive holdings, they would need to misstate and/or omit material information in order to generate the requisite interest in the Company's shares. In late June of 2004, nearly half a year after filing its new Registration Statement on December 9, 2003, defendants were nearly able to actually generate enough public interest in order to bring the Company public.

3.      In order to generate sufficient shareholder interest to consummate Motive's IPO, the Individual Defendants were forced to enter into an agreement whereby they were contractually

forbidden from selling any of their shares until December 21, 2004 (the "Lock-up"). To ensure that the price of Motive stock remained inflated until the Lock-up expired and the Individual Defendants were able to dump their shares, defendants utilized various accounting manipulations and caused to be disseminated to the markets earnings estimates that lacked any reasonable basis in fact. For example, in Spring 2005, the Company sold a license to an existing Company client (a reseller) and concurrently recognized $5.2 million in revenue for the license sale. Recognition of revenue from this sale was highly improper and violated the basic tenets of Generally Accepted Accounting Principles ("GAAP"). Not only did the reseller never pay the Company $5.2 million for the sale, the defendants actually knew (at the time of sale) the Company might never actually receive the recorded $5.2 million. In fact, defendants and the reseller had entered into a tacit contingent agreement with the reseller which only required the reseller to pay Motive *if and when* the reseller sublicensed (sold) Motive's product to a third part and recouped $5.2 million in the process. In fact, over the prior two and a half years, the Company and the reseller had similar tacit contingent agreements as to many other transactions which permitted Motive to prematurely recognize revenue, thereby inflating the perceived value of the Company. Motive continued to improperly record revenue from these contingent transactions in order to appear to have strong results. This illegal revenue recognition practice continued each quarter post-IPO but was most exploited immediately after the expiration of the Lock-up in order to make defendants' insider sales more lucrative vis-à-vis Motive's inflated share price. The Company partially disclosed its improper contingent sales in late October 2005, together with the fact that similar types of reseller contingent transactions contributed at least $3.8 million in revenue to Motive in 2004.

4.     Contingent transactions constituted only a portion of the fraud. At the time of the IPO, the Company was suffering from adverse business trends which were dramatically restructuring the way in which the Company was being paid. Broadband providers were demanding more of a

pay-as-you-go contract instead of the typical three-year contracts that Motive historically structured. Customers were paying less up front and asking for terms as short as 9-12 months.[1]  For example, despite six new transactions in the Company's most recent a quarter, revenue that could be recognized from new carrier deals was *de minimus*.[2]

5.     On October 27, 2005, before the market opened, the Company issued a release announcing that its preclusedly reported results for its Q1 and Q2 2005 earnings had to be restated. The release was entitled "Motive, Inc. Announces Third Quarter Results and Restatement of Results for Prior Two Quarters," and stated in part:

> Motive, Inc., a leading provider of management software, today announced financial results for the quarter ended Sept. 30, 2005, as well as the decision to restate its financial results for the quarters ended March 31, 2005, and June 30, 2005, and the six-month period ended June 30, 2005. As a result, the financial statements previously issued by Motive for these periods should no longer be relied upon.
>
> Third Quarter Results
>
>      For the third quarter of 2005, Motive's core revenue, which excludes the impact from business acquisitions, was $15.2 million, compared to $23.0 million for the third quarter of 2004. Total revenue for the third quarter of 2005, was $16.1 million, compared to $24.5 million for the third quarter of 2004.
>
>      Motive's pro forma net loss for the third quarter of 2005 was $4.5 million or ($0.17) per diluted share, compared to pro forma net income of $1.4 million or $0.05 per diluted share for the third quarter of 2004. Motive's GAAP net loss for the third quarter of 2005, was $6.7 million or ($0.25) per diluted share, compared to GAAP net income of $1.6 million or $0.06 per diluted share. A reconciliation of GAAP to pro forma results has been provided in the financial statement tables attached to this press release.
>
> Restatement
>
>      ***During the first quarter of 2005, Motive signed a new license agreement with one of its European resellers. The agreement provided for the reseller to pay Motive a total of $5.8 million in maintenance and license fees, and gave the***

---

[1]     Particularly in new customer relationships, emerging markets and value added services.

[2]     Less than $200,000.

*reseller the right to sublicense certain Motive software to a leading European broadband provider. Motive has had a relationship with this reseller for the last three years, during which the reseller has successfully completed several large transactions to provide Motive software to multiple broadband providers. The provider referenced in the reseller agreement has used Motive software for more than two years.*

*As of Oct. 26, 2005, the reseller had not paid $5.2 million, which was the initial payment invoiced upon execution of the agreement with 90-day payment terms. Although the agreement provides that the reseller's obligation to pay fees to Motive is not contingent upon the reseller sublicensing the Motive software, Motive now believes that the collection of the receivable is dependent upon the reseller sublicensing the software to its customer. Since this condition does not meet Motive's revenue recognition policy requirements, Motive decided on Oct. 26, 2005, to restate its financial results for the three-month periods ended March 31, 2005, and June 30, 2005, and the six-month period ended June 30, 2005, and will not reflect any revenue from this arrangement in the nine months ended Sept. 30, 2005. Motive will recognize revenue from this arrangement when Motive's revenue recognition criteria are met.*

*Motive will amend its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2005, and June 30, 2005, to reflect the restatement described above. The financial statement tables attached to this press release include the expected adjustments from this restatement. None of the adjustments resulting from the restatements has any impact on cash balances for any period.*

6.     As a result of this announcement, Motive's stock dropped to $3.66 per share, compared to its Class Period high of $15.25 per share.

7.     The true facts, which were know to defendants and based upon their access to and/or review of internal Motive corporate data during the Class Period, including, but are not limited to:

(a)     That for a period of nearly three years (2002-2005) the Company's finance/accounting departments lacked requisite internal controls necessary to make accurate financial reports and projections;

(b)     That for a period of at least three years the Company had been engaging in improper contingent sales with one of its key customers;

(c)     That demand for the Company's core activation and self service offerings had waned severely and could not contribute to the stellar growth defendants had claimed and projected;

- 4 -

(d)     That the "push-out" of new broadband services early on had terminated any basis for defendants even hoping for the growth they were repeatedly projecting;

(e)     That unlike most software companies, the Company was using an extremely aggressive accounting practice which allowed defendants (temporarily) to manipulate revenue and earnings for multiple quarters;

(f)     That for a significant amount of defendants' revenue, collection of such revenue was *contingent* upon the resale (and/or sublicense) of those licenses to third parties;

(g)     That the Company's customers either could not or would not purchase the Company's licenses, absent resale of the licenses. The Company used desperate measures to inflate the Company's income and revenue by selling millions of dollars worth of licenses to customers who could not pay or would not pay until they recouped the purchase price from resales;

(h)     That the Company's ability to report profit versus losses in Q1-Q2 2005 was dependent upon *one transaction* (with an approximate value of $5.8 million) and contingent upon a European broadband provider's ability to sublicense the Company's products;

(i)     That as a direct and proximate result of (a)-(h) above, the Company's projections for FY 2005 were materially false and misleading, as defendants had no reasonable basis to believe, and did not actually believe, that the Company's reported results were accurate and that, absent fraud, the Company's projections were unattainable; and

(j)     That as a direct proximate result of (a)-(h) above, the Company's reported financial results were misleading in violation of GAAP as detailed in ¶¶49-53.

8.     In response to these revelations of defendants' accounting shenanigans and Motive's earnings shortfalls for Q3 2005 and beyond, the market value of the Company plummeted by more than 35% during October 2005. The Company's internal corporate governance was ranked in the

bottom 6% of all Russell 3000 companies[3] and even Wall Street analysts who traditionally had been the Company's biggest supporters were outraged:

- *"[M]anagement credi[bility] under question."*

- *"[T]he health of Motive's carrier business has been worse than represented for some time."[4]*

- *"This practice is clearly questionable, given that this had been on going for 3 years . . . .*

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5], and §§11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, §27 of the Exchange Act and §22 of the Securities Act.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act, §22 of the Securities Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District, Motive conducts business in this District, and Motive's principal place of business is located at 12515 Research Blvd., Building 5, Austin, Texas.

12.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

---

[3]      ISS-October 2005.

[4]      Tim Klasell (Thomas Weisel Partners), Oct. 28, 2005.

## PARTIES

13.     Plaintiff Jonathan Cheek, as set forth in the accompanying certification and incorporated by reference herein, purchased Motive common stock at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Defendant Motive supplies management software for networked products and services. Its software is used to design self-management into various networked product and service offerings, such as residential dial-up and broadband Internet services; business broadband and networking services; home networking services; voice-over-Internet protocol services; IP-TV services; and remote software maintenance, as well as business intelligence services. Founded in 1997, Motive is headquartered and may be served at 12515 Research Blvd., Building 5, Austin, Texas.

15.     (a)     Defendant Scott L. Harmon ("Harmon") was, throughout the Class Period, Chairman and Chief Executive Officer of the Company. During the Class Period, Harmon sold 32,000 Motive shares for insider trading proceeds of more than $286,000. Further, Harmon signed the materially false and misleading Registration Statement. Defendant Harmon may be served at 10401 Yucca Drive, Austin, Texas 78759.

(b)     Defendant Michael J. Maples, Sr. ("Maples") is a director of the Company. Maples signed the materially false and misleading Registration Statement. Defendant Maples may be served at 2208 Windsor Road, Austin, Texas 78703.

(c)     Defendant Thomas J. Meredith ("Meredith") is a director of the Company. Meredith signed the materially false and misleading Registration Statement. Defendant Meredith may be served at 70 Pascal Lane, Austin, Texas 78746.

(d)     Defendant David Sikora ("Sikora") is a director of the Company. During the Class Period, Sikora sold 70,000 Motive shares for insider trading proceeds of more than $675,000.

Sikora signed the materially false and misleading Registration Statement. Defendant Sikora may be served at 2314 Island Wood Road, Austin, Texas 78733.

(e)     Defendant Paul M. Baker ("Baker") was, throughout the Class Period, Motive's Chief Financial Officer and Principal Accounting Officer. Baker signed the materially false and misleading Registration Statements. Defendant Baker may be served at 12515 Research Blvd., Building 5, Austin, Texas 78759.

(f)     Defendant Eric L. Jones ("Jones") was a director of the Company. Jones signed the materially false and misleading Registration Statement. Defendant Jones may be served at 213 Bella Riva, Austin, Texas 78734.

(g)     Defendant Michael LaVigna ("LaVigna") was a director of the Company. LaVigna signed the materially false and misleading Registration Statement. Defendant LaVigna may be served at 6007 Messenger Stake, Austin, Texas 78746.

(h)     Defendant John D. Thornton ("Thornton") was a director of the Company. Thornton signed the materially false and misleading Registration Statement. Defendant Thornton may be served at 3808 Balcones Drive, Austin, Texas 78731.

(i)     Defendant Scott R. Abel ("Abel") was the Executive Vice President of Enterprise Business of the Company. During the Class Period, Abel sold 80,000 Motive shares for insider trading proceeds of more than $813,000. Defendant Abel may be served at 6009 Maurys Trial, Austin, Texas 78730.

(j)     Defendant Douglas F. McNary ("McNary") was the Executive Vice President of Corporate Development of the Company. During the Class Period, McNary sold 100,000 Motive shares for insider trading proceeds of nearly $1 million. Defendant McNary may be served at 355 Atlantic Avenue, Cohasset, Massachusetts 02025.

(k)     The defendants named in (b) through (j) above are referred to herein as the "Individual Defendants."

16.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Motive, were privy to confidential and proprietary information concerning Motive, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Motive, as discussed in detail below. Because of their positions with Motive, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Motive's business.

18.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading,

prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

19.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Securities Act, and was traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Motive's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Motive's stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants are liable for their participation in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Motive common stock, which included the dissemination of materially false and misleading statements and/or the concealment of material adverse facts. Defendants' scheme: (i) deceived the investing public regarding Motive's business, operations and management and the intrinsic value of Motive stock; (ii) enabled the Individual Defendants to sell over 5 million shares of their Motive stock vis-à-vis the false Registration Statement which raised $50 million for the Company in badly needed cash; (iii) enabled the Individual Defendants to reap $2.7 million in insider trading proceeds; (iv) enabled the defendants to inflate the value of their individual stock options which could be used as a source of collateral for defendants' own personal financing activities; and (v) caused plaintiff and members of the Class to purchase Motive common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Motive common stock during the Class Period and who were damaged thereby (the "Class"), including those who purchased the shares pursuant or traceable to the Company's false and misleading Registration Statement and Prospectus disseminated in connection with the IPO.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Motive stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Motive or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- 11 -

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Motive;

(c)     whether the price of Motive common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

27.     Motive is a leading supplier of self-managed software for networked products and services.  Over 100 businesses have used Motive software to design self-management capabilities into more than 200 different products and services.  For the digital Home, Motive products help automate provisioning, installation, and end-user support for broadband service providers and hardware vendors.   In the enterprise, Motive enables automated support and configuration management for infrastructure.  Key customers and partners include 3Com, Alcatel, BEA, Cognos, HPQ, IBM, PeopleSoft, Softbank BB, Spring, Swisscom, Telecom Italia and Verizon.

28.     The Company's IPO was extremely difficult to consummate. Few companies, if any, have experienced the level of difficulty that was experienced by Motive in going public. On July 13, 2000, the Company filed its Registration Statement with the SEC in hopes of going public shortly

thereafter.  With the meltdown of the Internet/software companies, interest in bringing the Company public waned.  After defendants initially withdrew the Company's Registration Statement in the Spring of 2001, the Company made another attempt in the Winter of 2003/2004.  With the Company on life support (unbeknownst to prospective investors), defendants needed to bring the Company public at almost any cost.  Waiting for the Company's *true* condition to improve was not an option. Defendants realized that in order to raise $50 million to keep the Company afloat and provide a vehicle to monetize their own Motive holdings, they would need to misstate and/or omit material information in order to generate the requisite interest in the Company's shares.  In late June of 2004, nearly half a year after filing its new Registration Statement on December 9, 2003, defendants were nearly able to actually generate enough public interest in order to bring the Company public.

29.     In order to generate sufficient shareholder interest to consummate Motive's IPO, the Individual Defendants were forced to enter into an agreement whereby they were contractually forbidden from selling any of their shares until December 21, 2004.  To ensure that the price of Motive stock remained inflated until the Lock-up expired and the Individual Defendants were able to dump their shares, defendants utilized various accounting manipulations and caused to be disseminated to the markets earnings estimates that lacked any reasonable basis in fact.  For example, in Spring 2005, the Company sold a license to an existing Company client (a reseller) and concurrently recognized $5.2 million in revenue for the license sale.  Recognition of revenue from this sale was highly improper and violated the basic tenets of GAAP.  Not only did the reseller never pay the Company $5.2 million for the sale, the defendants actually knew (at the time of sale) the Company might never actually receive the recorded $5.2 million.  In fact, defendants and the reseller had entered into a tacit contingent agreement with the reseller which only required the reseller to pay Motive *if and when* the reseller sublicensed (sold) Motive's product to a third part and recouped $5.2 million in the process.  In fact, over the prior two and a half years, the Company and the reseller

had similar tacit contingent agreements as to many other transactions which permitted Motive to prematurely recognize revenue, thereby inflating the perceived value of the Company. Motive continued to improperly record revenue from these contingent transactions in order to appear to have strong results. This illegal revenue recognition practice continued each quarter post-IPO but was most exploited immediately after the expiration of the Lock-up in order to make defendants' insider sales more lucrative vis-à-vis Motive's inflated share price. The Company partially disclosed its improper contingent sales in late October 2005, together with the fact that similar types of reseller contingent transactions contributed at least $3.8 million in revenue to Motive in 2004.

30.     Contingent transactions constituted only a portion of the fraud. At the time of the IPO, the Company was suffering from adverse business trends which were dramatically restructuring the way in which the Company was being paid. Broadband providers were demanding more of a pay-as-you-go contract instead of the typical three-year contracts that Motive historically structured. Customers were paying less up front and asking for terms as short as 9-12 months (particularly in new customer relationships, emerging markets and value added services). For example, despite six new transactions in the Company's most recent a quarter, revenue that could be recognized from new carrier deals was *de minimus*.[5]

## SUBSTANTIVE ALLEGATIONS

31.     Defendants completed Motive's IPO on June 24, 2004, pursuant to a false Registration Statement/Prospectus which failed to disclose the truth concerning its revenue recognition practices as detailed at ¶¶49-53. With respect to the Company's "Revenue Recognition," the Registration Statement stated:

Revenue Recognition

---

[5]     Less than $200,000.

License fees revenue is comprised of fees for term and, to a lesser extent, perpetual licenses of our software.  To date, we have not entered into any software arrangement solely for the license of products and, therefore, we have not demonstrated vendor specific objective evidence ("VSOE") of fair value for the license element.  We (1) recognize revenue for the fees associated with a perpetual license or a term license with VSOE for maintenance using the residual method in accordance with Statement of Position ("SOP") 98-9, Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions, regardless of any separate prices stated within the contract for each element, or (2) recognize revenue for the fees associated with a term license without VSOE for maintenance ratably over the term of the agreement, generally one to three years.  Prior to the fourth quarter of 2001, we did not have VSOE to determine the fair value of maintenance for term licenses.  As a result, license fees revenue also includes maintenance for term licenses entered into prior to the establishment of VSOE of maintenance for term licenses. License fees revenue is recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, no unfulfilled vendor obligations remain, the fee is fixed or determinable and collectibility is probable.

If the fee for the license has any payment terms that are in excess of our normal payment terms, the fee is considered not to be fixed or determinable.  In this scenario, the amount of revenue recognized for perpetual license arrangements and term license arrangements with VSOE for maintenance is limited to the amount currently due from the customer.  In such arrangements, license fees are recognized as license fees revenue as the related amounts become due.  Because each such arrangement is individually negotiated, the payment schedule and resulting revenue recognition associated with each agreement can vary.  The amount of revenue recognized for term license arrangements without VSOE for maintenance is limited to the lesser of the amount due from the customer during each reporting period and a ratable portion of the total unallocated arrangement fee.  In most cases, this means that both license fees and maintenance associated with the underlying arrangement are recognized as license fees revenue ratably over the term of the contract, which generally tends to defer revenue recognition over longer periods of time.  To the extent that sufficient amounts are not due from the customer to cover the ratable revenue recognition for an applicable period, the amount of revenue recognized is limited to the amount currently due.

If an arrangement includes a right of acceptance or a right to cancel, revenue is recognized when acceptance is received or the right to cancel has expired.

License fees revenue from arrangements with resellers involving nonrefundable fixed minimum license fees are recognized when payment becomes due from the customer and delivery of the product has occurred, assuming no significant unfulfilled vendor obligations remain.  Royalties related to such reseller arrangements in excess of the fixed minimum amounts are recognized as revenue when such amounts are reported to us.

32.     With respect to the Company's valuation of doubtful accounts, the Registration

Statement stated in part:

Allowance for Doubtful Accounts

We continuously assess the collectibility of outstanding customer invoices and in
doing so, we maintain an allowance for estimated losses resulting from the non-
collection of customer receivables.  In estimating this allowance, we consider factors
such as: historical collection experience; a customer's current credit worthiness;
customer concentration; age of the receivable balance, both individually and in the
aggregate; and general economic conditions that may affect a customer's ability to
pay.  Actual customer collections could differ from our estimates and accordingly
could exceed our related loss allowance.

33.     Following the close of the market, on June 24, 2004, *Bloomberg* published an article

entitled "Motive, Software Company, Raises $50 Mln in Initial Offering," which stated in part that

Motive had raised $50 million in an IPO to pay debt and fund its business by selling 5 million shares

*at $10 each, compared with a price range of $11 to $14* a share indicated in an SEC filing.

34.     On July 21, 2004, the Company issued a press release entitled "Motive, Inc. Reports

Second Quarter Financial Results; Core revenue of $22.0 million – 30% increase from Q2 2003."

The release stated:

Motive, Inc., a provider of management software that enables technology products to
manage themselves, today announced results for the quarter ended June 30, 2004.
Motive's core revenue, which excludes revenue acquired in business combination,
was $22.0 million for the second quarter of 2004, a 30% increase over the same
period in 2003 and a 14% increase over the first quarter of 2004.  Motive's total
revenue for the second quarter of 2004 was $24.0 million.

Motive's pro forma net income for the second quarter of 2004 was $798,000
or $0.04 per diluted share, compared to $257,000 or $0.01 per diluted share for the
same period in 2003, and $617,000 or $0.03 per diluted share for the first quarter of
2004.  Motive's GAAP net loss for the second quarter of 2004 was $2.1 million or
$(0.20) per basic share.  A reconciliation of GAAP to pro forma results has been
provided in the financial statement tables included in this press release.

*"Motive's second quarter results reflect the demand in the market for a new
type of software that applies service-centric management to leading-edge Internet
technologies being widely adopted in homes, small business and enterprises," said
Scott Harmon, CEO of Motive.  "We are very pleased to see the investments we've
made in new products and market opportunities paying off."*

*"Our terrific execution allowed us to outperform our revenue and profit targets in the second quarter," said Logan Wray, COO of Motive. "Looking ahead, we are excited about our prospects for continued growth and solid results as we continue to apply our model in new segments and geographies."*

\*    \*    \*

**Financial Outlook**

*Core revenue is expected to be in the range of $22.4 million to $22.7 million for the third quarter of 2004 and in the range of $95 million to $97 million for the 12 months ending June 30, 2005. Pro forma earnings are expected to be $0.04 per diluted share for the third quarter of 2004.*

35.    On October 20, 2004, the Company issued a release reporting Motive's "record" Q3 2004 financial results. The release stated:

- License revenue exceeds consensus analyst estimates, drives core revenue growth of 51% over prior year

- Pro forma earnings of $0.05 per diluted share exceed consensus analyst estimates; GAAP earnings of $0.06 per diluted share

    . . . Motive, Inc., a leading provider of management software, today announced results for the quarter ended September 30, 2004. Core revenue, which excludes services revenue acquired in business combination, was $23.0 million for the third quarter of 2004, a 51 percent increase over the same period in 2003. Motive's total revenue for the third quarter of 2004 was $24.5 million, a 23 percent increase over the same period in 2003.

36.    On December 21, 2004, the Lock-up expired, allowing defendants to sell their own personal Motive holdings. Defendants immediately began to take advantage of the expiration by selling Motive shares into the market at prices inflated by defendants' false statements. In all, defendants sold 282,000 shares and pocketed in excess of $2.7 million before their scheme unraveled.

37.    On January 25, 2005, the Company issued a release entitled "Motive, Inc. Reports Record Earnings for Fourth Quarter and Fiscal Year 2004." The release stated:

    --    Exceeded fourth quarter consensus estimates for both core and total revenue

- 17 -

    --     Fourth quarter pro forma earnings of $0.10 per diluted share also exceeded consensus estimates; GAAP earnings of $0.09 per diluted share

Motive, Inc., a leading provider of management software, today announced results for the fourth quarter and fiscal year 2004. Core revenue for the fourth quarter of 2004, which excludes services revenue acquired in business combination, was a record $25.3 million, a 12 percent increase over the fourth quarter of 2003. Motive's total revenue for the fourth quarter of 2004 was $26.8 million. Core revenue for 2004 was $89.6 million, a 33 percent increase over 2003. Total revenue for 2004 was $98.0 million.

Motive's pro forma net income for the fourth quarter of 2004 was $2.7 million or $0.10 per diluted share, compared to $1.9 million or $0.09 per diluted share for the fourth quarter of 2003. Motive's GAAP net income for the fourth quarter of 2004 was $2.5 million or $0.09 per diluted share compared to $1.0 million or $0.05 per diluted share for the fourth quarter of 2003. Motive's pro forma net income for 2004 was $5.5 million or $0.22 per diluted share, compared to $3.9 million or $0.19 per diluted share for 2003. Motive's GAAP net income for 2004 was $0.4 million or $0.02 per diluted share, compared to a net loss of $1.2 million or $0.12 per diluted share for 2003.

A reconciliation of GAAP to pro forma results has been provided in the financial statement tables included in this press release.

*"This quarter's results have made a significant contribution to a record year for Motive," said Scott Harmon, CEO of Motive, Inc. "We exceeded expectations of our business, particularly with respect to growth, where focused execution translated into expanded market opportunities and strategic, long-term relationships with some of the world's leading technology service providers. We are entering 2005 with a strong position, selling into a market that we believe holds significant opportunity."*

*"Once again this quarter we delivered excellent results at both the top and bottom lines based on our ability to up-sell to existing customers and penetrate new and emerging markets with highly targeted product offerings," said Logan Wray, COO of Motive, Inc. "Given the momentum we're seeing in the service provider market, the growing demand among enterprise companies, and our continued product innovation, we are well-positioned to build on our success into 2005."*

*In 2004, Motive had significant growth in the number of companies using its management software to build intelligent automation directly into a new generation of smart service-oriented networks. These now include 34 broadband service providers, nine of which are in the top 16 in North America, EMEA and Japan; two of the top CRM providers; and a leading application server provider. As a result, Motive's software is now built into more than 200 broadband and corporate enterprise services, and has been used to manage more than 40 million end points worldwide.*

38.     On April 21, 2005, the Company issued a press release entitled "Alcatel and Motive

Join Forces to Meet Triple Play Digital Home Management Challenge," which stated in part:

> *"The advancement of broadband technology provides tremendous new opportunities for service providers seeking to grow and expand their business in a highly competitive climate," said Scott Hamon, CEO at Motive, Inc. "Our relationship with Alcatel will help operators worldwide implement Triple Play strategies that bring new information, communication and entertainment services to consumers, enabled by the combination of powerful broadband network solutions and customer service management technologies."*

39.     On April 21, 2005, the Company issued a release announcing its Q1 2005 earnings.

The release stated:

- License revenue of $14.1 million reflects 22 percent growth over prior year

- First quarter pro forma earnings of $0.05 per diluted share exceeds consensus estimates; GAAP earnings of $0.02 per diluted share

. . . Motive, Inc., a leading provider of management software, today announced results for the first quarter ended March 31, 2005. Core revenue, which excludes impact from business acquisitions, was $23.3 million, a 21 percent increase over the first quarter of 2004. Total revenue for the first quarter of 2005 was $24.6 million.

Motive's pro forma net income for the first quarter of 2005 was $1.5 million or $0.05 per diluted share, beating consensus estimates by a penny. Motive's GAAP net income for the first quarter of 2005 was $600,000 or $0.02 per diluted share, compared to a loss of $1.6 million or $0.16 per diluted share for the first quarter of 2004. A reconciliation of GAAP to pro forma results has been provided in the financial statement tables included in this press release.

> *"For the fourth consecutive quarter, our results have met or exceeded expectations. We believe this demonstrates that we are in the right markets with the right products at the right time," said Scott Harmon, CEO of Motive. "The need for our management automation software remains strong as companies continue to invest heavily in the delivery of sophisticated networked products and services to mainstream enterprise and consumer customers."*

> *"The rigor and discipline we put into developing arguably the industry's most full-featured product set continues to pay-off and provide the business leverage we planned," said Logan Wray, COO of Motive. "We believe this is one of the primary reasons we have been able to garner almost twice the number of customers as our nearest competitor."*

40.     On June 12, 2005, the Company's Vice President of Worldwide Sales (Jeff Burke),

who shared the responsibility for the questionable $5.8 million sale, resigned from his Vice President

position long before the details of the sale were revealed to the public.  While defendants knew this

event was highly material to the Company's past and future, the Company buried this fact in a Form

8-K filed with the SEC.

41.     On July 11, 2005, the Company issued a release announcing its preliminary Q2 2005

results.  The release stated:

> Motive, Inc., a leading provider of management software, today announced
> preliminary results for the second quarter ended June 30, 2005. The company expects
> core revenue for the second quarter of 2005, which excludes impact from business
> acquisitions, to be in the range of $21 million to $22 million, compared to core
> revenue of $22 million for the same period last year. Total revenue for the second
> quarter of 2005 is expected to be in the range of $22 million to $23 million.
>
> Motive's pro forma earnings per share for the second quarter of 2005 is
> expected to be in the range of $0.00 to $0.02 per diluted share, compared to pro
> forma earnings per share of $0.04 per diluted share for the same period last year.
> Motive's GAAP loss per share for the second quarter of 2005 is expected to be in the
> range of ($0.05) to ($0.07) per diluted share. Pro forma earnings per share excludes
> the amortization of acquired technology, intangibles and deferred stock
> compensation and a charge associated with a legal settlement, and assumes a pro
> forma effective tax rate of 35%.
>
> ***"Although this quarter we added several new customers and renewed and
> extended relationships with a number of existing customers, we had a significant
> transaction push out past the end of the quarter and our consulting services
> revenue fell short of our estimates," said Scott Harmon, CEO of Motive. "While we
> are disappointed with our expected second quarter financial results, we do not
> believe they are indicative of a decline in the need for our management automation
> software."***

42.     On July 27, 2005, the Company issued a release announcing its Q2 2005 results.  The

release stated:

> •   License fee revenue for first half of 2005 up 9% over prior year
>
> •   Use of Motive's solutions exceeds 45 million endpoints worldwide
>
> . . . Motive, Inc., a leading provider of management software, today
> announced results for the quarter ended June 30, 2005. Core revenue, which excludes
> the impact of business acquisitions, was $21.7 million, a one percent decrease from

the second quarter of 2004. Total revenue for the second quarter of 2005 was $22.7 million.

Motive's pro forma net income for the second quarter of 2005 was $0.3 million or $0.01 per diluted share as compared to $0.8 million or $0.04 per diluted share for the second quarter of 2004. Motive's GAAP net loss for the second quarter of 2005 was $1.8 million or ($0.07) per share, compared to a net loss of $2.1 million or ($0.20) per share for the second quarter of 2004. A reconciliation of GAAP to pro forma results has been provided in the financial statement tables included in this press release.

*"I am confident in the strength of our markets, particularly as broadband providers continue to invest heavily in the roll-out of advanced services. In addition, I am excited by the increasing role for Motive's software in addressing the complexity of new enterprise applications," said Scott Harmon, CEO of Motive. "I believe that our management software products are well-positioned to take advantage of these opportunities in both the near- and long-term."*

Current Highlights

- Signed five new contracts over $1 million and expanded relationships with broadband providers in current and new geographies, including Bell Canada, BellSouth, Cable & Wireless, Softbank BB, Telewest and regional provider Talk America.

- Gained significant momentum with strategic partner Alcatel in new geographies, including Eastern Europe, Asia, Latin America and the Middle East.

- Continue to see strong customer traction with leading global financial services enterprises for Motive's application configuration management solution.

- Expanded broadband product line with the launch of IPTV FAST and Security FAST modules as part of Digital Home Management strategy.

- Motive has now reached more than 45 million endpoints worldwide.

Financial Outlook

*Core revenue for the third quarter of 2005 is expected to be in the range of $23.5 million to $24.5 million, and total revenue is expected to be in the range of $24.5 million to $25.5 million. Core revenue for the fiscal year 2005 is expected to be in the range of $95.5 million to $97.5 million, and total revenue is expected to be in the range of $99.5 million to $101.5 million. Pro forma earnings are expected to be in the range of $0.05 to $0.06 per diluted share for the third quarter of 2005 and in the range of $0.21 to $0.24 per diluted share for fiscal year 2005.*

43.     On October 4, 2005, the Company issued a release announcing its Q3 2005 results. The release stated that Motive was "Focusing on Core Strength in Communications Market, Reducing Costs and Evaluating Alternatives for Enterprise Business," and noted:

> Motive, Inc., a leading provider of management software, today announced preliminary results for the third quarter ended September 30, 2005. The company expects core revenue for the third quarter of 2005, which excludes impact from business acquisitions, to be in the range of $15.5 million to $17.5 million, compared to core revenue of $23 million for the same period last year. Total revenue for the third quarter of 2005 is expected to be in the range of $16.5 million to $18.5 million.
>
> Motive's pro forma loss per share for the third quarter of 2005 is expected to be in the range of ($0.12) to ($0.17) per diluted share, compared to pro forma earnings per share of $0.05 per diluted share for the same period last year. Motive's GAAP loss per share for the third quarter of 2005 is expected to be in the range of ($0.20) to ($0.27) per diluted share. Pro forma earnings and loss per share exclude (i) the amortization of acquired technology, intangibles and deferred stock compensation and (ii) receipt of cash associated with a legal settlement, and assume a pro forma effective tax rate of 35 percent.
>
> "These results have led us to make significant changes in two key areas," said Scott Harmon, CEO of Motive. "First, with regard to our enterprise business, we have decided that the investment necessary for Motive to cultivate relationships with Global 2000 enterprises is greater than we can sustain, and we are reviewing strategic options for this business. As a result, we will focus on our core strength in the communications market which will drive the company's future strategic direction and success. Second, we are taking immediate steps to bring our cost structure in line with our new business requirements."
>
> Harmon added: "Most importantly, I believe that the changes we are making will allow us to focus 100 percent on growing our leadership position in the communications market and expanding our relationships with the world's leading telecommunications and cable broadband companies."
>
> ***"Given the anticipated changes to our business, we no longer expect to achieve the revenue and EPS guidance that we previously released for the remainder of 2005," said Paul Baker, CFO of Motive.***
>
> All statements relating to the company's third quarter financial performance contained in this release are preliminary and may change based on the completion by the company's management and independent auditors of customary quarterly closing and review procedures.

44.     The October 4, 2005 revelations caused the Company's shares to fall more than 33%

on huge volume of 8 million shares traded on October 5, 2005, as the market digested the

Company's abandonment of its projections for Q3 2005 and for the remainder of 2005.

## THE TRUTH BEGINS TO EMERGE

45.     On October 27, 2005, before the market opened, the Company issued a press release

announcing the restatement of its Q1 and Q2 2005 earnings.  The release was entitled "Motive, Inc.

Announces Third Quarter Results and Restatement of Results for Prior Two Quarters," and stated:

> Motive, Inc., a leading provider of management software, today announced financial
> results for the quarter ended Sept. 30, 2005, as well as the decision to restate its
> financial results for the quarters ended March 31, 2005, and June 30, 2005, and the
> six-month period ended June 30, 2005. As a result, the financial statements
> previously issued by Motive for these periods should no longer be relied upon.

> Third Quarter Results

> For the third quarter of 2005, Motive's core revenue, which excludes the
> impact from business acquisitions, was $15.2 million, compared to $23.0 million for
> the third quarter of 2004. Total revenue for the third quarter of 2005, was $16.1
> million, compared to $24.5 million for the third quarter of 2004.

> Motive's pro forma net loss for the third quarter of 2005 was $4.5 million or
> ($0.17) per diluted share, compared to pro forma net income of $1.4 million or $0.05
> per diluted share for the third quarter of 2004. Motive's GAAP net loss for the third
> quarter of 2005, was $6.7 million or ($0.25) per diluted share, compared to GAAP
> net income of $1.6 million or $0.06 per diluted share. A reconciliation of GAAP to
> pro forma results has been provided in the financial statement tables attached to this
> press release.

> **Restatement**

> ***During the first quarter of 2005, Motive signed a new license agreement
> with one of its European resellers. The agreement provided for the reseller to pay
> Motive a total of $5.8 million in maintenance and license fees, and gave the
> reseller the right to sublicense certain Motive software to a leading European
> broadband provider. Motive has had a relationship with this reseller for the last
> three years, during which the reseller has successfully completed several large
> transactions to provide Motive software to multiple broadband providers. The
> provider referenced in the reseller agreement has used Motive software for more
> than two years.***

> As of Oct. 26, 2005, the reseller had not paid $5.2 million, which was the
> initial payment invoiced upon execution of the agreement with 90-day payment

terms. Although the agreement provides that the reseller's obligation to pay fees to Motive is not contingent upon the reseller sublicensing the Motive software, Motive now believes that the collection of the receivable is dependent upon the reseller sublicensing the software to its customer. Since this condition does not meet Motive's revenue recognition policy requirements, Motive decided on Oct. 26, 2005, to restate its financial results for the three-month periods ended March 31, 2005, and June 30, 2005, and the six-month period ended June 30, 2005, and will not reflect any revenue from this arrangement in the nine months ended Sept. 30, 2005. Motive will recognize revenue from this arrangement when Motive's revenue recognition criteria are met.

Motive will amend its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2005, and June 30, 2005, to reflect the restatement described above. The financial statement tables attached to this press release include the expected adjustments from this restatement. None of the adjustments resulting from the restatements has any impact on cash balances for any period.

46.     In response to these revelations of defendants' accounting chicanery, the price of the Company's stock continued to plummet, falling by more than 35% between October 4 and October 27, 2005.

47.     Even Wall Street analysts who traditionally had been the Company's cheerleaders were outraged:

- "This practice is clearly questionable, given that this had been on going for 3 years . . . ."

- "[M]anagement credi[bility] under question."

- "[T]he health of Motive's carrier business has been worse than represented for some time."

Tim Klasell (Thomas Weisel Partners) Oct. 28, 2005

## UNDISCLOSED ADVERSE INFORMATION

48.     The true facts, which were know to defendants and based upon their access to and/or review of internal Motive corporate data during the Class Period, including, but are not limited to:

(a)     That for a period of nearly three years (2002-2005) the Company's finance/accounting departments lacked requisite internal controls necessary to make accurate financial reports and projections;

- 24 -

(b)     That for a period of at least three years the Company had been engaging in improper contingent sales with one of its key customers;

(c)     That demand for the Company's core activation and self service offerings had waned severely and could not contribute to the stellar growth defendants had claimed and projected;

(d)     That the "push-out" of new broadband services early on had terminated any basis for defendants even hoping for the growth they were repeatedly projecting;

(e)     That unlike most software companies, the Company was using an extremely aggressive accounting practice which allowed defendants (temporarily) to manipulate revenue and earnings for multiple quarters;

(f)     That for a significant amount of defendants' revenue, collection of such revenue was *contingent* upon the resale (and/or sublicense) of those licenses to third parties;

(g)     That the Company's customers either could not or would not purchase the Company's licenses, absent resale of the licenses.  The Company used desperate measures to inflate the Company's income and revenue by selling millions of dollars worth of licenses to customers who could not pay or would not pay until they recouped the purchase price from resales;

(h)     That the Company's ability to report profit versus losses in Q1-Q2 2005 was dependent upon *one transaction* (with an approximate value of $5.8 million) and contingent upon a European broadband provider's ability to sublicense the Company's products;

(i)     That as a direct and proximate result of (a)-(h) above, the Company's projections for FY 2005 were materially false and misleading, as defendants had no reasonable basis to believe, and did not actually believe, that the Company's reported results were accurate and that, absent fraud, the Company's projections were unattainable; and

(j)     That as a direct proximate result of (a)-(h) above, the Company's reported financial results were misleading in violation of GAAP as detailed in ¶¶49-53.

49.    In fact, Motive's financials had been false for nearly one year due to its improper revenue recognition practice.  As a result, Motive's results were presented in violation of Generally Accepted Accounting Principles ("GAAP").

50.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.

51.    In fact, contrary to Motive's representations in its SEC filings about revenue recognition, the  Company does not consistently require that collectibility be probable prior to recognition.

52.    Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatements and revisions announced by Motive were to correct for material errors in previously issued financial statements.  APB No. 20, ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *Id.* ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.,* when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.  Motive's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatements and revisions were an admission by defendants

that Motive's previously issued financial results and its public statements regarding those results were false and misleading. Moreover, immaterial corrections are not required to be restated. APB No. 20, ¶38. *Thus, the restatement indicates that the errors were material.*

53.     As a result of these materially false and misleading statements and failures to disclose, Motive's common stock traded at inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Motive common stock relying upon the integrity of the market price of Motive common stock and market information relating to Motive, and have been damaged thereby.

## ADDITIONAL SCIENTER ALLEGATIONS

54.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Motive, their control over, and/or receipt and/or modification of Motive's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Motive, participated in the fraudulent scheme alleged herein.

| Defendant Name | No. of Shares | Total Proceeds |
|---|---|---|
| Abel | 80,000 | 813,277 |
| Harmon | 32,000 | 286,679 |
| McNary | 100,000 | 998,555 |
| Sikora | 70,000 | 675,850 |
| **Totals** | **282,000** | **$2,774,361** |

## LOSS CAUSATION/ECONOMIC LOSS

55.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Motive's stock price and operated as a fraud or deceit on Class Period purchasers of Motive stock by misrepresenting the Company's business success and future business prospects.  Defendants achieved this façade of success, growth and strong future business prospects by misrepresenting the Company's financial statements, earnings and prospects.  Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Motive stock fell precipitously as the prior artificial inflation came out of Motive's stock price.  As a result of their purchases of Motive stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

56.     During the Class Period, the defendants presented a misleading picture of Motive's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Motive's business was not as healthy as represented, defendants caused Motive to falsely report its results and forecasted earnings.  During the Class Period, defendants repeatedly emphasized Motive was "exceeding expectations" when, in fact, it used improper accounting to make these claims.

57.     These false claims of current earnings that met expectations and strong future results caused and maintained the artificial inflation in Motive's stock price throughout the Class Period and until the truth was revealed to the market.

58.     Defendants' false and misleading statements had the intended effect and caused Motive stock to trade at artificially inflated levels throughout the Class Period, trading as high as $15.25 per share.

59.     On October 4, 2005, defendants were forced to publicly disclose that Motive would report much lower results in 2005 than prior representations.  Subsequently, on October 27, 2005, Motive announced it would restate its results due to improper revenue recognition.

60.     As a direct result of defendants' admissions and the public revelations regarding the truth about Motive's previous representations and its actual business prospects going forward, Motive's stock price plummeted 35%, falling from $6.26 on October 5, 2005 to $4.01 per share on October 6, 2005, a drop of $2.25 per share, and to $3.66 on October 27, 2005.  These drops removed the inflation from Motive's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.  In sum, as the truth about defendants' fraud and Motive's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of approximately $2.60 per share.

61.     The 35% decline in Motive's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Motive's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  During the same period in which Motive's stock price fell 35% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat.  The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Motive's stock price and the subsequent significant decline in the value of Motive's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### Violation of Section 11 of the Securities Act Against Defendants Motive, Harmon, Jones, Maples, Meredith, LaVigna, Thornton and Baker

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Plaintiff for purposes of this claim disclaims any allegations of fraud.  This claim is brought on behalf of a Class of all purchasers of Motive's common stock issued pursuant to the Registration Statement/Prospectus who were damaged thereby, seeking to pursue remedies under the Securities Act against Motive, the issuer of the stock, Harmon, Jones, Maples, Meredith, Sikora, LaVigna, Thornton and Baker, who were directors and/or signatories of the Registration Statement.

63.     Motive, as the issuer, and the other defendants as signers of the Registration Statement, which contained untrue statements of material fact or omitted to state facts required to be stated therein or necessary to make the statements therein not misleading, and are liable under §11(a)(1) and (2).

64.     Each of the defendants named in this Count is liable under §11(a) because the Registration Statement, when it became effective, contained an untrue statement of material fact or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

65.     Motive went public in June 2004 in an IPO pursuant to the Registration Statement filed with and declined effective by the SEC at $10.00 per share.  Motive sold 5 million shares pursuant thereto, raising over $50 million.

66.     Harmon, Jones, Maples, Meredith, Sikora, LaVigna, Thornton and Baker each signed the Registration Statement.  Because the Registration Statement contained untrue statements of material fact or omitted to state a material fact required to be stated therein or necessary to make the facts stated therein not misleading, each of these defendants is liable as "a person who signed the Registration Statement," under §11(a)(1), 15 U.S.C. §77k(a)(1).

67.     Harmon, Jones, Maples, Meredith, Sikora, LaVigna and Thornton were directors of Motive when the Registration Statement became effective.  Because the Registration Statement contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the facts stated therein not misleading, each of these defendants is liable as a director under §11(a)(2), 15 U.S.C. §77k(a)(2).

68.     Plaintiff and other members of the Class purchased Motive common stock pursuant and traceable to the stock offering without knowledge of the untruths or omissions alleged herein, and sustained damages as a result.  Plaintiff and the other members of the Class could not have reasonably discovered the nature of defendants' untruths and omissions.

69.     This action was brought within one year after the discovery of the untrue statements and omissions and less than three years after the stock offering.

## COUNT II

### Violation of Section 15 of the Securities Act
### Against Defendants Harmon and Baker

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Plaintiff for purposes of this claim disclaims any allegations of fraud.  Harmon and Baker, by reason of their positions with Motive and their stock ownership, were controlling persons of Motive and are liable under §15 of the Securities Act.

## COUNT III

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

71.     Plaintiff repeats and realleges each and every allegation contained in ¶¶1-61 as if fully set forth herein.

72.     During the Class Period, Motive and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class

Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Motive common stock; and (c) cause plaintiff and other members of the Class to purchase Motive common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

73.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain an artificially high market price for Motive common stock in violation of §10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

74.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's stock would be based on truthful, complete and accurate information.

75.    Motive and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Motive as specified herein.

76.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Motive's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Motive and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Motive common stock during the Class Period.

77.     The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

78.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.     Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Motive's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its stock.     As demonstrated

by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

79.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Motive common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Motive common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Motive common stock during the Class Period at artificially high prices and were damaged thereby.

80.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Motive, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Motive common stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

81.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

82.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT IV

### Violation of Section 20(a) of
### the Exchange Act Against All Defendants

83.     Plaintiff repeats and realleges each and every allegation contained in ¶¶1-61 and 71-82 as if fully set forth herein.

84.     The Individual Defendants acted as controlling persons of Motive within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Company controlled the Individual Defendants and all of its employees.

86.     As set forth above, Motive and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as

controlling persons, the defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Motive's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as lead plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as lead counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such equitable/injunctive or other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 18, 2005

Respectfully submitted,

*Darren J. Robbins*  ~/ permission

DARREN J. ROBBINS

WILLIAM S. LERACH
California State Bar No. 68581
DARREN J. ROBBINS
California State Bar No. 168593
LERACH COUGHLIN STOIA GELLER &
ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)


JOSEPH F. BROPHY
State Bar No. 00787146
BISHOP LONDON BROPHY DODDS, P.C.
The Littlefield Building
106 East 6th Street, Suite 700
Austin, TX  78701
Telephone:  512/479-5900
512/479-5934 (fax)


JOE KENDALL
State Bar No. 11260700
WILLIE C. BRISCOE
State Bar No. 24001788
PROVOST & UMPHREY LAW FIRM, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

- 37 -

KIP B. SHUMAN
Colorado State Bar No. 23593
DYER & SHUMAN, LLP
801 East 17th Avenue
Denver, CO  80218-1417
Telephone:  303/861-3003
303/830-6920 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Motive.doc

Exhibit A

Dyer & Shuman, LLP
801 East 17th Avenue
Denver, CO 80218-1417
(303) 861-3003

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.      The undersigned has reviewed the complaint and approves its filing.

2.      The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3.      The undersigned is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      The undersigned's transaction(s) in Motive, Inc. securities during the class period (December 8, 2004 - July 12, 2005 ) is/are as follows:

| Transaction Date(s) | # of Shares | Buy or Sell | Price Per Share |
|---|---|---|---|
| 12/22/04 | 240 | Buy | 12.37 |
| ( 10/5/05 | 240 | Sell | 3.97 ) |

5.      During the three years prior to the date of this Certificate, the undersigned has sought to serve or served as a representative party for a class in the following actions under the federal securities laws:

6.      The undersigned will not accept any payment for serving as a representative party on behalf of the class beyond the undersigned's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of _November 11_, 2005.

_Jonathan Cheek_
[signature]

Jonathan Cheek
Please print name.